**UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| LABORERS' PENSION FUND, *et al.*, | ) | |
| | ) | |
| Plaintiffs, | ) | Case No. 19-cv-1609 |
| | ) | |
| v. | ) | Hon. Steven C. Seeger |
| | ) | |
| TOTAL HOME | ) | |
| RESTORATION 1, *et al.*, | ) | |
| | ) | |
| Defendants. | ) | |
| _____ | ) | |

## <u>MEMORANDUM OPINION AND ORDER</u>

This case is the second installment in a long-running attempt to compel Kevin Ciccone and his companies to pay contributions owed under a collective bargaining agreement. Once again, Ciccone and his companies failed to pay what they owe. And once again, this Court will hold them accountable for their obligations.

Kevin Ciccone owned a general contractor company named Total Home Restoration 1. Ciccone signed a collective bargaining agreement that required Total Home to make contributions for fringe benefits for covered employees. Total Home agreed to pay contributions to various funds (the plaintiffs here), who are multiemployer benefit plans under ERISA. But between 2012 and 2016, Total Home didn't live up to its end of the bargain.

The funds later filed suit in federal court to collect the unpaid contributions. Total Home settled that case, and agreed to pay $132,500 over the next two years. Ciccone sweetened the deal by signing a personal guaranty, agreeing to backstop Total Home if it did not live up to its commitments.

While that dispute was brewing, Ciccone formed a second business called KAAT. Unlike Total Home, KAAT was a non-union company. KAAT did not pay union wages, and did not make fringe benefit contributions, either.

Apart from the name and the use of non-union labor, not much else changed. KAAT looked eerily similar to Total Home. Total Home and KAAT shared the same employees, managers, client, and business address. Money flowed between them. And during one big project, Kevin Ciccone shifted his laborers between Total Home and KAAT.

Two years later, Total Home went out of business, and Ciccone formed a new company, JK Installation, that sprung from Total Home's ashes. JK Installation was Total Home in all but name. The two companies shared the same employees, equipment, managers, client, and business address. And once again, Ciccone's company did not pay fringe benefit contributions or union dues.

For the second time, the funds filed suit to recover unpaid contributions. The funds brought claims against all three companies: Total Home, KAAT, and JK Installation. The funds argue that KAAT and Total Home are a single employer, and thus share responsibility for contributions under the collective bargaining agreement. The funds also contend that JK Installation is the successor to Total Home, so the obligations of the collective bargaining agreement carry over to that company, too. Finally, the funds seeks to hold Ciccone personally responsible for everything under his guaranty.

After discovery, the funds moved for summary judgment. For the reasons stated below, the motion for summary judgment is granted.

## Background

Before diving into the facts, the Court offers one prefatory note. The Local Rules govern how to respond to a movant's statement of facts. "A response may not assert legal arguments except to make an objection, including objections based on admissibility, materiality, or absence of evidentiary support." *See* L.R. 56.1(e)(2). Disputing a fact requires coming forward with evidence of a countervailing fact. "To dispute an asserted fact, a party must cite specific evidentiary material that controverts the fact and must concisely explain how the cited material controverts the asserted fact. Asserted facts may be deemed admitted if not controverted with specific citations to evidentiary material." *See* L.R. 56.1(e)(3).

Defendants honored Local Rule 56.1 in its breach. By and large, the response was insubstantial. *See* Defs.' Resp. to Pls.' Statement of Facts (Dckt. No. 102). For example, Defendants objected to dozens of paragraphs on the grounds that they contained "conclusions of fact and law." They objected to the legibility of the scanned copy of the CBA. They objected that some paragraphs contained more than one fact. And so on. The verbiage contributed little except taking up space, making noise, and gumming up the works.

The non-moving party cannot respond to a statement of material facts with filler, bluster, empty chatter, and hot air. Without belaboring the point, the Court will simply say that it accepts any properly supported facts offered by the funds that did not receive a response that complied with the Local Rules.

## I.      Total Home (the First Company)

Kevin Ciccone was the president of Total Home, a general contractor. *See* Defs.' Resp. to Pls.' Statement of Facts, at ¶¶ 5, 25 (Dckt. No. 102). In April 2007, Total Home signed a collective bargaining agreement with the Construction and the General Laborers' District

3

Council of Chicago and Vicinity (the "Union"). *Id.* at ¶ 8; *see also* 2007 CBA (Dckt. No. 94-1, at 26 of 26).

The 2007 CBA required Total Home to make contributions to the funds for covered employees. *See* Defs.' Resp. to Pls.' Statement of Facts, at ¶ 8 (Dckt. No. 102).[1] Total Home agreed to make contributions "for each hour worked" on behalf of its employees for pension benefits, health and welfare benefits, and/or benefits for the training fund. *Id.* at ¶ 9. To that end, the CBA required Total Home to submit monthly remittance reports to the Union, identifying the amount of contributions owed for each covered employee. *Id.* The CBA required Total Home to pay union dues, too. *Id.* at ¶ 16.

The 2007 CBA ran through May 2010. But it also continued in perpetuity unless a party gave written notice of a desire to change it. "This Agreement shall remain in full force and effect from June 1, 2006 (unless dated differently below) through May 31, 2010, and *shall continue thereafter* unless there has been given written notice . . . of the desire to modify or amend this Agreement through negotiations." *See* 2007 CBA, at ¶ 10 (Dckt. No. 94-1, at 26 of 26) (emphasis added). There is nothing in the record suggesting that any party ever gave any such notice. So the 2007 CBA continued.

The 2007 CBA incorporated by reference any collective bargaining agreements between the Union and a local association of contractors, called the Chicago Area Independent Construction Association. Total Home "affirms and adopts the applicable Collective Bargaining

---

[1] Defendants hammer the point that the agreement is "illegible." *See* Defs.' Resp. to Pls.' Statement of Facts, at ¶¶ 8, 9, 10, 15, 16, 17 (Dckt. No. 102). They argue that the illegibility of the agreement renders it unenforceable. *Id.* Defendants miss the target, by a country mile. The copy of the agreement attached to the complaint does have some blurry text. *See* 2007 CBA (Dckt. No. 1, at 17 of 28). But the original wasn't fuzzy. In fact, a readable copy is in the record. *See* 2007 CBA (Dckt. No. 94-1, at 26 of 26). Defendants admit that Total Home agreed to the collective bargaining agreement: "Without waiving objection, it is admitted that the Union and THRI are parties to the Agreement and that the agreement is attached to the Complaint as Exhibit A." *See* Defs.' Resp. to Pls.' Statement of Facts, at ¶ 8.

Agreement(s), as designated by the Union, between the Union and . . . the Chicago Area Independent Construction Association." *Id.* at ¶ 2. So Total Home hitched its wagon to any collective bargaining agreement between the Union and the local association.

The 2007 CBA reiterated that, if the agreement extended into the future, it would include the terms of any collective bargaining agreement involving the local construction association. "In the absence of such notice [meaning a notice expressing a desire to amend the agreement] *the Employer and the Union agree to be bound by the new applicable association agreement(s)*, incorporating them into this Agreement and extending this Agreement for the life of the newly negotiated agreements, and thereafter for the duration of successive agreements . . . ." *Id.* at ¶ 10 (emphasis added).

The record includes two such agreements. The first is a collective bargaining agreement between the Union and the construction association covering June 2013 to May 2017. *See* 2013 CBA (Dckt. No. 94-2). The second is a collective bargaining agreement between the Union and the construction association running from June 2017 to May 2021. *See* 2017 CBA (Dckt. No. 94-3). Both agreements applied to Total Home. As Total Home admitted in its answer: "[t]he Union and Company have been parties to successive collective bargaining agreements, the most recent of which became effective June 1, 2017." *See* Answer, at ¶ 7 (Dckt. No. 19).

The 2013 and 2017 CBAs included a broad definition of covered employees. Frankly, the list of covered tasks is so long – going on and on, for page after page – that it leads one to wonder what *isn't* covered. *See* 2013 CBA, at Art. 12, ¶ 2 (Dckt. No. 94-2, at 33 of 97); 2017 CBA, at Art. 12, ¶ 2 (Dckt. No. 94-3, at 34 of 93). For present purposes, the important thing is that the agreements covered unloading, handling, and distributing materials, fixtures, furnishings,

furniture, and appliances from the point of delivery to the point of installation.  *Id.*  When it came to a construction site, the CBAs covered getting things from "here" to "there."

Total Home performed work that fell within that generous definition.  Beginning in 2010, Total Home transported appliances for high rise construction projects.[2]  *See* Defs.' Resp. to Pls.' Statement of Facts, at ¶ 58 (Dckt. No. 102); Timothy Ciccone Dec., at ¶ 3 (Dckt. No. 94-5, at 16 of 64).  The company installed the appliances in the units through union laborer employees.  *See* Timothy Ciccone Dec., at ¶ 3.  Total Home performed that work until late 2018.  *See* Defs.' Resp. to Pls.' Statement of Facts, at ¶ 58.

## II.    KAAT (the Second Company)

In November 2016, Kevin Ciccone incorporated a new company:  KAAT Inc.  *Id.* at ¶ 50. KAAT employees primarily worked as hotel remodelers.  *Id.*  They would destroy walls, remove debris, and transport furniture.  *Id.*

The main difference between Total Home and KAAT was the use of union labor.  Total Home relied on union employees.  But KAAT did not.  *Id.*

Apart from their names, and their use of union labor, not much else was different between the two companies.  They shared the same business address, the same bank, the same

---

[2] Defendants deny this fact because it is "an oversimplification of THR1's operations."  *See* Defs.' Resp. to Pls.' Statement of Facts, at ¶ 58 (Dckt. No. 102).  But Defendants offer no evidence that Total Home didn't operate as a transporter of appliances for high rise construction projects.  Rule 56.1(e) requires a party to "cite specific evidentiary material that controverts the fact" to dispute a fact.  *See* L.R. 56.1(e)(3). Otherwise, "[a]sserted facts may be deemed admitted if not controverted with specific citations to evidentiary material."  *Id.*  Throughout its response, Defendants deny asserted facts without providing any admissible evidence.  *See, e.g.*, Defs.' Resp. to Pls.' Statement of Facts, at ¶¶ 11, 12, 13, 14, 20, 21, 22, 24, 33, 35, 36, 37, 39, 40, 41, 42, 43, 44, 45, 46, 48, 49, 50, 51, 52, 53, 54, 55, 56, 57, 58, 60, 63, 68, 69, 70, 71, 73, 74, 75, 78, 80 (Dckt. No. 102).  Denials without countervailing evidence aren't worth much. The Court deems admitted all properly supported facts offered by the funds when Defendants responded with mere denials.

registered agent, the same phone number, and the same fax number. *Id.* at ¶¶ 27–29, 34. They both performed most of their work in Cook County. *Id.* at ¶ 33.

Money freely flowed between the two companies. *Id.* at ¶¶ 43–46. "[I]f the companies did not have enough money to cover payroll or other financial obligation[s]," Ciccone "would then go to BMO Harris and transfer money from one entity to another." *Id.* at ¶ 43.

The management was the same, too. Kevin Ciccone was the president of both companies. *Id.* at ¶ 25. He performed the same duties for each company, including bidding for work, negotiating and signing contracts, hiring and firing employees, determining salaries of office staff, and handling any major work-related problems. *Id.* at ¶ 36.

Other personnel overlapped, too. Tim Ciccone (Kevin Ciccone's son) worked for both Total Home and KAAT at the same time. *Id.* at ¶ 40. From December 2016 until April 2017, Tim Ciccone managed both companies' bank accounts, accounts payable and receivable, and payroll. *Id.* at ¶¶ 38, 42–43.

In early 2017, the line between the companies continued to blur. The same employees started working for both companies. *Id.* at ¶ 51. Most of KAAT's laborers were employees of Total Home, too, and Total Home laborers would shift to KAAT to perform certain jobs. *See* Timothy Ciccone Dec., at ¶ 20 (Dckt. No. 94-5, at 20 of 64). The line between the companies blurred until it disappeared altogether.

A project on the Magnificent Mile revealed the interchangeability of the employees. Laborers for both companies worked on a remodeling project at the Marriott Downtown Magnificent Mile hotel. *See* Defs.' Resp. to Pls.' Statement of Facts, at ¶ 53 (Dckt. No. 102); Kevin Ciccone Dec., at ¶ 27 (Dckt. No. 104-1). The project ran from January to March or April 2017. *See* Defs.' Resp. to Pls.' Statement of Facts, at ¶ 53. This work included distributing

7

furniture and appliances from point of delivery to installation, interior demolition, trash removal and clearing debris. *Id.*

During that project, Kevin Ciccone decided which laborers worked for Total Home or KAAT, and when. *Id.* at ¶ 51. At his direction, the employees would switch back and forth, working for Total Home and for KAAT during the same work week. *Id.* at ¶¶ 53–54.

When the laborers worked for Total Home, the company submitted fringe benefit reports and contribution payments under the relevant CBAs. *Id.* at ¶ 51. But when the laborers worked for KAAT, the company did not pay fringe benefit contributions to the Union, and did not pay the employees on the union wage scale. *Id.* at ¶¶ 52, 56. All told, fifteen KAAT laborers did not receive fringe benefit contributions or union wages for their work between January and April 2017. *Id.* at ¶ 57.

## III.    The First Lawsuit

In November 2016, several multiemployer benefit plan funds sued Total Home in federal court for failure to pay union dues or submit employee benefit reports from January 2012 to December 2016. *See Laborers Pension Fund v. Total Home Restoration*, No. 16-cv-10381 (N.D. Ill.). They filed suit in this district, and the case was assigned to Judge Guzman.

The parties settled a year and a half later, in March 2018. *See* Defs.' Resp. to Pls.' Statement of Facts, at ¶ 20 (Dckt. No. 102). Total Home signed an Installment Note to pay overdue fringe benefit contributions, plus liquidated damages, interest, and attorney's fees. *Id.*; *see also* Installment Note (Dckt. No. 94-5, at 4 of 64). That number came to $132,500 plus interest. Total Home agreed to pay it over a span of 24 months, from April 2018 to April 2020.

Kevin Ciccone personally guaranteed payment of the Note. *See* Defs.' Resp. to Pls.' Statement of Facts, at ¶ 21 (Dckt. No. 102); *see also* Guaranty of Payment and Indemnification

(Dckt. No. 94-5, at 9 of 64).  Ciccone agreed that he was "personally liable for all monthly

benefit contributions, union dues and/or wages owed from the Company to the Funds, the

District Council, all ancillary funds, and/or the participants that are due at the time the Note and

Guaranty are entered into and/or are incurred and become due and owing for the duration of the

Note . . . including all interest, liquidated damages, audit costs, attorneys' fees and costs."  *See*

Guaranty, at ¶ 1.

Ciccone signed the Installment Note and Guaranty in March 2018, but Total Home

ceased operations in November 2018.  *See* Defs.' Resp. to Pls.' Statement of Facts, at ¶ 59 (Dckt.

No. 102).  It closed up shop after an employee suffered an injury.  *Id.*; *see also* Kevin Ciccone

Dep., at 18:9-18 (Dckt. No. 106-1, at 19 of 64).[3]  At least nominally, anyway.

Total Home defaulted on its remaining payments to the funds.  *See* Defs.' Resp. to Pls.'

Statement of Facts, at ¶ 24 (Dckt. No. 102).  In January 2019, Judge Guzman entered judgment

against Total Home for the balance of the Note ($65,447.82), plus $500 for attorney's fees and

expenses.  *Id.*; 10/1/19 Order, in *Laborers Pension Fund v. Total Home Restoration*, No. 16-cv-

10381 (N.D. Ill.) (Dckt. No. 94-9, at 33 of 33).  That judgment remains outstanding.  *See* Defs.'

Resp. to Pls.' Statement of Facts, at ¶ 24.

## IV.    JK Installation (the Third Company)

The demise of Total Home led to the birth of a third company, JK Installation.  Kevin

Ciccone formed JK Installation in November 2018, almost immediately after Total Home ceased

---

[3]  The funds failed to include a few pages from Kevin Ciccone's deposition in their original summary
judgment filing, and that omission prompted objections from Defendants.  *See* Kevin Ciccone Dep. (Dckt.
No. 94-8, at 52–53 of 81) (skipping from page 17 to 35); Defs.' Resp. to Pls.' Statement of Facts, at
¶¶ 32, 47, 59, 61, 62, 64 (Dckt. No. 102).  Defendants did not object on the merits – they simply objected
to the failure to include the facts.  Plaintiffs later cured the omission by submitting the complete
transcripts.  *See* Kevin Ciccone Dep. (Dckt. No. 106-1).  So there is no issue.

operations. *Id.* at ¶ 59. From a corporate standpoint, the body of Total Home was still warm when JK Installation sprang into existence.

The workers didn't skip a beat. All of the union laborers and office employees of Total Home transferred to JK Installation. *Id.*

Once again, the overlap between the companies was substantial. Kevin Ciccone was the president of both Total Home and JK Installation. The two companies shared the same business address, the same bank, the same registered agent, and the same phone number. *Id.* at ¶¶ 27–29, 34. Total Home transferred all of its equipment and client contracts to JK Installation, too. *Id.* at ¶ 60.

Total Home and JK Installation shared the same client, too. *Id.* at ¶ 32. In fact, each of them worked for one (and only one) client. *Id.*

From December 2018 and December 2019, JK Installation engaged in the same business as Total Home, transporting appliances at construction sites. *Id.* at ¶ 62.

JK Installation paid its laborers union wages as required by the CBA. *Id.* at ¶ 63. But JK Installation failed to make any fringe benefit contributions and failed to pay union dues.[4] *See* Pls.' Statement of Facts, at ¶ 63 (Dckt. No. 94).

JK Installation ran into difficulty in December 2019. The company's only client terminated its contract. *See* Defs.' Resp. to Pls.' Statement of Facts, at ¶ 63 (Dckt. No. 102). JK Installation quickly went out of business. *Id.* It laid off all its employees in January 2020 and filed for Chapter 7 bankruptcy in March 2020. *Id.*

---

[4] Kevin Ciccone disputes this fact without pointing to any record evidence, though he later argues that he attempted to pay the dues but was rejected. *See* Defs.' Resp. to Pls.' Statement of Facts, at ¶ 63; *see also* Defs.' Resp. to Pls.' Supp. Statement of Facts, at ¶ 7 (Dckt. No. 108); Kevin Ciccone Dec., at ¶¶ 12–17 (Dckt. No. 104-1).

V.      **The Audit**

While Kevin Ciccone was busy shuffling and swapping employees between Total Home and KAAT, the funds performed an audit on all three companies.  *Id.* at ¶ 66.  The goal was to determine whether they owed fringe benefits contributions or union dues.  *Id.*

Total Home, KAAT, and JK Installation submitted their books and records for an audit covering January 2017 to December 2019.  *Id.*  The audit took place in the spring of 2019.  *See* Laborers' District Council Audit (Dckt. No. 94-8, at 3 of 81).

The audit report concluded that Total Home, KAAT, and JK Installation failed to report or pay fringe benefit and union dues contributions.  *See* Defs.' Resp. to Pls.' Statement of Facts, at ¶¶ 71–74 (Dckt. No. 102).  The underreporting was substantial.

The audit found that Total Home had failed to pay contributions for fringe benefits and union dues for 449.50 work hours.  *Id.* at ¶ 71.  Those unpaid hours covered the period from January 2017 to December 2018.[5]

By starting in January 2017, the audit began after the period covered by the first lawsuit and the Note (January 2012 to December 2016).  In other words, the 449.50 hours were above and beyond the amount owed by Total Home as covered in the first lawsuit.  The audit picked up from where the first lawsuit left off.

KAAT's underreporting was more than double that amount.  KAAT failed to report and pay contributions for almost 1,200 work hours.  *Id.* at ¶ 73.  And JK Installation's underreporting blew the doors off.  JK Installation failed to report or pay contributions for more than 10,000 work hours.  *Id.* at ¶ 74.

---

[5]  There was nothing to audit for Total Home for 2019, because it was out of business.

Daniel Timm, the payroll auditor manager responsible for the audits, confirmed the accuracy of the report. *See* Timm Dec. (Dckt. No. 94-7, at 57 of 60). The record also includes the basis for the audit's findings, meaning the source material. The audit of Total Home and JK Installation involved reviews of weekly QuickBooks payroll details, monthly bank statements, W-2s, and quarterly payroll taxes. *See* Defs.' Resp. to Pls.' Statement of Facts, at ¶ 69 (Dckt. No. 102). The audit of KAAT relied on invoices for KAAT laborers' work at the Marriott hotel project in 2017, which contained the hours worked by each laborer. *Id.* at ¶ 70.

Based on those findings, the audit concluded that the three companies owed $367,050.39 in unpaid fringe benefit contributions. *Id.* at ¶ 75; *see also* Laborers' District Council Audit (Dckt. No. 94-8, at 3 of 81); Timm Dec., at ¶ 10 (Dckt. No. 94-7, at 59 of 60); Laborers' District Council Reconciliation of Differences Per Year (Dckt. No. 94-4, at 3 of 72). The record includes extensive records showing how the auditor reached that number. That amount ($367,050.39) includes unpaid amounts for Total Home ($13,512.74), KAAT ($32,988.97), and JK Installation ($320,548.68).

The audit then added a liquidated damages penalty against Total Home ($4,318.29) and an audit fee ($5,229.92), raising the amount owed to $376,598.60. *See* Laborers' District Council Audit (Dckt. No. 94-8, at 3 of 81). Other liquidated damages ($71,129.15) and accumulated interest ($35,572.00) increased the amount owed. *See* Summary of Amounts Owed (Dckt. No. 94-4, at 17 of 72); Marcello Dec., at ¶¶ 6–10 (Dckt. No. 94-1, at 21 of 26).

When it was all said and done, the audit concluded that the funds were owed a grand total of $483,299.75. *See* Defs.' Resp. to Pls.' Statement of Facts, at ¶ 77 (Dckt. No. 102).

## VI.  The Suit at Hand

In March 2019, before the audit and calculation of unpaid union dues and fringe benefits, the funds filed this lawsuit.  *See* Cplt. (Dckt. No. 1).  The funds brought five claims.  The first two claims are against Total Home and Ciccone.  The third claim is against KAAT.   The fourth claim is against JK Installation.  The fifth claim is against Ciccone.

Count I is about unpaid benefit contributions.  Count I alleges that Total Home and Ciccone breached the 2007 CBA by failing to report, and failing to pay, contribution benefits beginning in November 2018.  In addition, Count I requests an order compelling Total Home to provide books and records to the auditor for the period beginning in January 2017.  And Count I requests any amounts owed based on the findings of that audit.  *Id.* at ¶¶ 10–16.

Count II is similar, but it is about unpaid union dues.  Count II alleges that Total Home and Ciccone breached the 2007 CBA by failing to report, and failing to pay, union dues beginning in November 2018.  *Id.* at ¶¶ 17–22.

Count III alleges that KAAT is liable for the obligations of Total Home.  The funds claim that KAAT is an alter ego of Total Home, and/or is a single employer with the company.  *Id.* at ¶¶ 25–33.

Count IV is nearly the same, except that the defendant is JK Installation.  Count IV alleges that JK Installation is liable for the obligations of Total Home.  The funds claim that JK Installation is an alter ego of Total Home, and/or is a single employer with the company.  *Id.* at ¶¶ 36–44.

Count V alleges that Ciccone breached the Guaranty by failing to pay the remaining balance owed by Total Home on the Installment Note from the last litigation ($65,447.82).  *Id.* at ¶ 50.

13

After discovery, the funds moved for summary judgment. *See* Mtn. for Summ. J. (Dckt. No. 92).

## Legal Standard

A district court "shall grant" summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." *See* Fed. R. Civ. P. 56(a). A genuine dispute of material fact exists if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). The party seeking summary judgment has the burden of establishing that there is no genuine dispute as to any material fact. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). To survive summary judgment, the opposing party must go beyond the pleadings and identify specific facts showing the existence of a genuine issue for trial. *See Anderson*, 477 U.S. at 256.

The Court construes all facts in the light most favorable to the nonmoving party, giving him the benefit of all reasonable inferences. *See Chaib v. Geo Grp., Inc.*, 819 F.3d 337, 341 (7th Cir. 2016). The Court does not weigh the evidence, judge credibility, or determine the truth of the matter, but rather determines only whether a genuine issue of triable fact exists. *See Nat'l Athletic Sportswear, Inc. v. Westfield Ins. Co.*, 528 F.3d 508, 512 (7th Cir. 2008). Summary judgment is appropriate if, on the evidence provided, no reasonable jury could return a verdict in favor of the non-movant. *See Celotex Corp.*, 477 U.S. at 322; *Gordon v. FedEx Freight, Inc.*, 674 F.3d 769, 772–73 (7th Cir. 2012).

## Analysis

The funds move for summary judgment against each defendant, which sounds simple enough. But the motion for summary judgment does not break it out by count. Instead, their

14

brief argues that KAAT is liable for Total Home's liabilities (*see* Pl.'s Mem. in Supp. of its Mtn. for Summ. J., at 3–7, 8–10 (Dckt. No. 93)), and then that JK Installation is liable for Total Home's liabilities (*id.* at 8–10). At that point, their brief addresses the liabilities of all three companies as a group. *Id.* at 10–13. And then, the funds address Ciccone's liabilities. It seems to back into the conclusion, through a round-about circuitous route.

The Court can understand why the funds proceeded that way. Still, it becomes a bit of a mish-mash, blending everything together. The complaint advances individual claims against individual defendants, and that pleading provides the structure for the case. The funds have now moved for summary judgment on the complaint, and it is important to keep the individual claims in mind. The complaint provides the bones, and the motion for summary judgment should flesh it out.

The Court will get there, through a different route. The Court will first address the liabilities of Total Home. Then, the Court will turn to whether KAAT and JK Installation are on the hook, too, either because they constitute a single employer with Total Home or because they are successors. If so, they can be responsible for Total Home's liabilities, and they can be liable to pay contributions in their own right, too. And then, the Court will end with Ciccone.

## I.      Total Home (Counts I & II)

The first two claims involve the liabilities of Total Home for unpaid fringe benefit contributions and unpaid union dues.[6] There are two claims. There isn't much dispute.

The funds presented evidence that Total Home underpaid fringe benefits and dues. Specifically, the audit revealed that Total Home failed to pay contributions for fringe benefits and union dues for 449.50 hours worked by laborer employees. *See* Defs.' Resp. to Pls.'

---

[6] Counts I and II also allege claims against Kevin Ciccone. But for the sake of clarity, the Court will address all pending claims against Ciccone, including Counts I, II, and V, in a later section of the opinion.

Statement of Facts, at ¶ 72 (Dckt. No. 102). That work took place in February 2017, May 2018, November 2018, and December 2018. *Id.*

Based on the calculations offered by the fund, Total Home owes a total of $13,512.74 for the 449.50 hours of work from January 2017 to December 2018 (when Total Home ceased operations).

As an aside, the funds argued in their briefs that Total Home owes $14,237.71. *See* Pls.' Reply, at 1 (Dckt. No. 105); *see also* Pls.' Statement of Facts, at ¶ 72 (Dckt. No. 94); Timm Dec., at ¶ 7 (Dckt. No. 94-7, at 59 of 60); Laborers' District Council Audit (Dckt. No. 94-8, at 4–5, 8–11 of 81). That number is incorrect. The funds double counted working dues ($724.97).

The correct number for the amount owed is $13,512.74, not $14,237.71.[7] Again, that amount covers the period from January 2017 to December 2018. It is above and beyond the remaining amount owed by Total Home under the Note from the first lawsuit ($65,447.82, plus attorney's fees of $500 and expenses).

Defendants do not muster any meaningful response. They do not deny that Total Home had an obligation to pay contributions for fringe benefits and dues. They do not offer any basis to question the number offered by the funds based on the audit. And they do not offer a number of their own.

---

[7] The $13,512.74 comes from three reports in the audit. *See* Laborers' District Council Audit (Dckt. No. 94-8, at 4–5, 8–11 of 81) (finding Total Home responsible for $323.49, $234.68, and $12,954.57 based on unreported hours and unpaid union wages). The funds state that Total Home is responsible for $14,237.71. *See* Pl.'s Reply, at 1 (Dckt. No. 105). Specifically, the funds mistakenly added three additional amounts to the $13,512.74 (namely, $17.34, $12.36, and $695.27) for a new total of $14,237.71. *Id.* at 5, 9, 11. But those three amounts – based on working dues – were already included in the audit's total of $13,512.74 for Total Home's unpaid contributions. *Id.* at 4, 8, 10. The Court double checked its work as follows. The audit gives a sum total of $367,050.39 in unpaid contributions. You can get that figure by adding together $13,512.74 (Total Home), $32,988.97 (KAAT), and $320,548.68 (JK Installation). If the number for Total Home was $14,237.71 instead of $13,512.74, then the overall number would have been higher. So, $13,512.74 must be the right number, or else the total amount of unpaid contributions ($367,050.39) would need to be higher.

Their response consists of a flat denial without any citation to the record, which isn't much of a response. *See* Defs.' Resp. to Pls.' Statement of Facts, at ¶ 72 (Dckt. No. 102); *see also* Defs.' Resp., at 14–16 (Dckt. No. 104). Then, Defendants fault the funds for offering a "cumulative assessment of damages" that does not differentiate between the companies. *See* Defs.' Resp., at 15. In reality, the audit did, in fact, analyze each company separately.

Based on the undisputed facts, the Court concludes that Total Home owes $13,512.74, covering the period from January 2017 to November 2018.

## II.    KAAT (Count III)

Count III is against KAAT, the second company. The funds allege that Total Home attempted to avoid its obligations under the CBA by shifting union work to non-union workers at KAAT. The complaint alleged that the ties between the two companies are so tight that KAAT is bound by the CBA, for one of two reasons. The funds claimed that KAAT is Total Home's alter ego, or that the two companies are a single employer.

The funds moved for summary judgment based on the second theory. They argue that Total Home and KAAT are, for all intents and purposes, a single employer. If they are a single employer, then the CBA signed by Total Home would bind KAAT, too.

That conclusion would have two important implications. First, KAAT would have to pay contributions on behalf of its laborers, even though they were non-union employees. Second, Total Home would be on the hook for the collective bargaining liabilities of KAAT. In sum, if they are a single employer, then KAAT's employees would be entitled to contributions – even though KAAT never signed the CBA – and both KAAT and Total Home would have joint and several liability to pay them.

17

The Court will address whether there is any genuine issue of material fact about whether the single employer doctrine applies. And if so, the Court will address the amount owed.

### A.    The Single Employer Doctrine

"The single employer doctrine holds that when two entities are sufficiently integrated, they will be treated as a single entity for certain purposes." *Moriarty v. Svec*, 164 F.3d 323, 334 (7th Cir. 1998). "Specifically, when two businesses are considered a 'single employer,' 'both businesses will be equally liable under a collective bargaining agreement entered on behalf of only one of them.'" *Int'l Ass'n of Heat & Frost Insulators Loc. 17 Pension Fund v. CEC Env't, Inc.*, 530 F. Supp. 3d 757, 761 (N.D. Ill. 2021) (quoting *Laborers' Pension Fund v. GA Paving, LLC*, 2018 WL 3659338, at *6 (N.D. Ill. 2018)).

Four factors determine whether multiple employers constitute a single employer for purposes of a CBA: "(1) interrelation of operations, (2) common management, (3) centralized control of labor relations, and (4) common ownership." *See Chicago Regional Council of Carpenters Pension Fund v. Carlson Constructors Corp.*, 2022 WL 874608, at *11 (N.D. Ill. 2022) (quoting *Lippert Tile Co. v. Int'l Union of Bricklayers & Allied Craftsmen*, 724 F.3d 939, 946 (7th Cir. 2013)).

"No one of these factors is conclusive; instead, the decisionmaker must weigh the totality of the circumstances." *Trs. of Pension, Welfare, & Vacation Fringe Benefit Funds of IBEW Loc. 701 v. Favia Elec. Co., Inc.*, 995 F.2d 785, 788 (7th Cir. 1993); *see also Chicago Reg'l Council of Carpenters Pension Fund v. TMG Corp.*, 206 F. Supp. 3d 1351, 1360 (N.D. Ill. 2016) ("[A] single employer finding does not require every factor to be met."). "Ultimately, single employer status is characterized by the absence of an arm's length relationship found among unintegrated

companies." *Cremation Soc'y of Illinois, Inc. v. Int'l Bhd. of Teamsters Loc. 727*, 869 F.3d 610, 616 (7th Cir. 2017) (citation omitted).

Total Home and KAAT check all of those boxes. They satisfy all four factors of the single-employer analysis, and then some. If anything, it is hard to see how the ties between Total Home and KAAT could be tighter.

First, when assessing the interrelatedness of two companies' operations, "day-to-day operational matters" carry the most weight. *See TMG Corp.*, 206 F. Supp. 3d at 1357 (quoting *Lippert Tile*, 724 F.3d at 947). Courts consider "whether purportedly separate businesses shared the maintenance of their business records, processed payroll jointly, processed their billing and bank accounts together, and shared space." *Id.*; *see also Midwest Operating Eng'rs Fringe Benefit Funds v. Sulzberger Excavating Co.*, 2017 WL 4074018, at *6 (N.D. Ill. 2017) ("Interrelated operations include companies that operate out of the same building, use the same employees, have the same organizational chart or management, operate in the same geographic market and industry with the same or similar customers, share computers and phone numbers, use the same bank accounts, or use the same payroll and billing entity.").

Total Home and KAAT shared the same business address, the same bank, the same registered agent, the same phone number, the same fax number, and the same client. *See* Defs.' Resp. to Pls.' Statement of Facts, at ¶¶ 27–29, 34 (Dckt. No. 102). The same employees went back and forth, working for both companies on the same projects. *Id.* at ¶¶ 51, 53–54. The companies shared money, too. Funds flowed between them, with a dozen transfers between the two companies totaling $71,000. *Id.* at ¶ 44.

Kevin Ciccone used the same email address and cell phone number to communicate with the employees of Total Home and KAAT. *Id.* at ¶ 37. Tim Ciccone (his son) worked for both

19

companies and equally managed their bank accounts, accounts payable and receivable, and weekly payroll. *Id.* at ¶ 43. The companies used the same accountant for tax filings, the same attorney, and the same bankruptcy attorney. *Id.* at ¶¶ 30–31.

Based on the undisputed facts in the record, Total Home and KAAT had interconnected, interwoven, interchangeable operations. They're hard to untangle.

The second and third factors – "common management" and "centralized control over labor relations" – are closely related. Common management looks at "actual or active control, as distinguished from potential control, over the other's day-to-day operations," with an emphasis on "common control over hiring and firing of employees, as well as other daily management decisions." *See Cremation Society of Illinois*, 869 F.3d at 617 (quoting *Lippert Tile*, 724 F.3d at 947); *Automobile Mechanics' Loc. No. 701 Union & Industry Pension Fund v. Dynamic Garage, Inc.*, 2018 WL 4699842, at *6 (N.D. Ill. 2018) (citation omitted). Centralized control of labor relations is about "who is responsible for hiring, firing and evaluating employees." *See Cremation Society of Illinois*, 869 F.3d at 617; *see also Board of Trustees of the Pipe Fitters Retirement Fund, Loc. 597 v. Am. Weathermakers, Inc.*, 150 F. Supp. 3d 897, 907 (N.D. Ill. 2015).

Once again, Total Home and KAAT fit the bill. The same person, Kevin Ciccone, managed both companies. He held actual control over both companies' day-to-day operations. He demonstrated that control when the companies shared work on the Marriott hotel project. He made daily decisions about which laborers worked for which company – sometimes shifting the workers around during the same week. At both companies, Ciccone was singularly responsible for hiring, firing, setting salaries, and handling work-related problems.

20

The fourth and final factor, common ownership, is straightforward. "Common ownership typically applies when two companies are owned by the same individual(s)." *Chicago Reg'l Council of Carpenters Pension Fund v. United Carpet, Inc.*, 2020 WL 3077541, at *3 (N.D. Ill. 2020) (quoting *Fox Valley & Vicinity Construction Workers Welfare Fund v. Morales*, 2019 WL 247538, at *3 (N.D. Ill. 2019)). Kevin Ciccone formed and owned both Total Home and KAAT.

In sum, the two companies followed a what's-mine-is-yours, what's-yours-is-mine approach to the construction business. They shared just about everything, so they will share liabilities, too.

The material facts are undisputed. Based on the record, Total Home and KAAT are a single employer within the meaning of ERISA. The Court grants summary judgment to the funds on whether the single employer doctrine applies to Total Home and KAAT.[8]

## B.      Shared Liabilities

The conclusion that Total Home and KAAT are a single employer has a number of important ripple effects. For starters, KAAT is bound by the CBA entered into by Total Home. *See Int'l Ass'n of Heat & Frost Insulators Loc. 17 Pension Fund*, 530 F. Supp. 3d at 761; *see also Moriarty*, 164 F.3d at 327. In other words, KAAT had an obligation to comply with the terms of the CBA, including the obligations to pay contributions.

The funds offered evidence about the unpaid contributions by KAAT based on the Marriott hotel project. That project started in January 2017 and ended in March or April 2017, so the 2017 CBA applied. *See* 2017 CBA Memorandum (Dckt. No. 94-3).

---

[8] The complaint brings Count III under a theory of alter ego liability or single employer liability. *See* Cplt., at ¶¶ 25–33 (Dckt. No. 1). The funds only pursued single employer liability for KAAT in their motion for summary judgment, so the Court does not discuss the alter ego theory.

The audit calculated KAAT's delinquent payments during the Marriott hotel project. That audit concluded that KAAT failed to report and pay contributions for almost 1,200 work hours, resulting in $32,988.97 in outstanding payments.[9] Once again, Defendants do not dispute the numbers.

Instead, Defendants argue that the CBA did not apply because it was a non-union job. In their view, even if the CBA applied, KAAT had no obligation to follow it on this particular project because the Marriott hotel project was a non-union job. *See* Defs.' Response, at 7–8 (Dckt. No. 104). For support, Defendants attach Kevin Ciccone's declaration. *See* Kevin Ciccone Dec. (Dckt. No. 104-1).

In his declaration, Kevin Ciccone states that KAAT was offered the Marriott hotel project as a non-union job. According to him, KAAT was not paid union wages by the general contractor. KAAT told all its employees that the job was non-union, and only KAAT laborers who were comfortable with performing non-union work showed up at the project. *Id.* at ¶¶ 19–23. So, as Defendants see it, KAAT's work on the Marriott hotel project would not fall within the 2017 CBA.

That argument lands far off base. The applicability of the CBA depends on the content of the CBA, not on whether KAAT hatched a side deal with Marriott to use non-union workers.

Under the 2017 CBA, KAAT needed to provide pension, welfare, and industry fund contributions "for each hour worked by all Employees who are covered by this Agreement." *See* 2017 CBA Memorandum, at Art. 5, ¶ 2 (Dckt. No. 94-3); *id.* at Art. 5, ¶ 3; *id.* at Art. 7, ¶ 1. The Agreement defines covered work by describing different categories of tasks. *Id.* at Art. 12, ¶ 2.

---

[9] The $32,988.97 total is based on one report in the audit. *See* Laborers' District Council Audit (Dckt. No. 94-8, at 6–7 of 81) (finding KAAT responsible for $32,988.97 because of unreported hours and unpaid union wages).

Notably missing from the 2017 CBA is any definition of covered work that turns on an employee's union membership, or on whether the employee agreed to perform "union work," or on whether the general contractor designated the project as "union work." Indeed, Ciccone's declaration simply assumes that a General Contractor determines what work is covered under a CBA. Defendants never cite a provision in the CBA that supports that position.

The CBA dictates what is covered, and what is not. It identifies the covered work by putting the tasks into categories, which it calls "branches." One branch of work involves "[u]nloading, handling, and distributing of all materials, fixtures, furnishings, furniture, and appliances whether crated or uncrated from point of delivery to stockpiles and from stockpiles to approximate point of installation." *Id.* Another branch covers the "[c]leaning and clearing of all debris, including recycled material . . . in building and construction area." *Id.* And the CBA specifies that "[w]here a building is only partially wrecked and parts torn down for the purpose of building additions, alterations, remodeling, or repairing same, such work is covered by this Agreement, and rates as established herein shall apply." *Id.* at Art. 12, ¶ 6.

KAAT laborers performed that type of work during the Marriott hotel project. The laborers distributed furniture and appliances from point of delivery to point of installation, demolished interior spaces for remodeling, and removed trash and building debris. *See* Defs.' Resp. to Pls.' Statement of Facts, at ¶ 53 (Dckt. No. 102). Defendants do not point to anything in the record that contradicts these facts. *Id.* The 2017 CBA therefore applies to KAAT's work on the Marriott hotel project, and KAAT failed to pay its laborers union wage scale or make fringe benefit contributions for that work.

Based on the undisputed facts, the Court concludes that Total Home and KAAT are a single employer within the meaning of ERISA. KAAT is deemed to be a signatory to the

23

collective bargaining agreement with the Union. KAAT is responsible for unpaid contributions for 1,197.50 hours. *See* Defs.' Resp. to Pls.' Statement of Facts, at ¶ 53 (Dckt. No. 102). According to the audit, that underpayment results in a liability of $32,988.97. *See* Laborers' District Council Audit (Dckt. No. 94-8, at 6 of 81) (finding KAAT responsible for $32,988.97 because of unreported hours).

Because Total Home and KAAT are a single employer, they share all liabilities under the collective bargaining agreement. Total Home is responsible for KAAT's unpaid contributions totaling $32,988.97. On the flipside, KAAT is responsible for Total Home's unpaid contributions totaling $13,512.74. They're in the same wagon, and must carry the load together.

## III.    JK Installation (Count IV)

The fourth claim is against JK Installation. The funds argue that JK Installation is liable for Total Home's outstanding CBA obligations because JK Installation is a successor to Total Home.

The 2007 CBA contemplated the possibility that Total Home might transfer its business to someone else. In that case, the collective bargaining agreement would apply with full force to the successor. The CBA provided: "Successors. In the event of any change in the ownership, management or operation of the Employer's business or substantially all of its assets, by sale or otherwise, it is agreed that as a condition of such sale or transfer that the new owner or manager, whether corporate or individual, shall be fully bound by the terms and conditions of this Agreement." *See* 2007 CBA, at § 9 (Dckt. No. 94-1, at 26 of 26).

If there is a successor, the company must let the Union know. "The Employer shall provide no less than ten (10) days' prior written notice to the Union of the sale or transfer and

shall be obligated for all expenses incurred by the Union to enforce the terms of this paragraph." *Id.*

The question, then, is whether JK Installation is a successor to Total Home. "To determine whether one business is the successor of an earlier business for purposes of establishing successor liability, this Court looks to whether 1) the second business had notice of the earlier business's liabilities, and 2) whether there was substantial continuity between the operation of the two businesses." *See Dore & Assocs. Contracting, Inc. v. Int'l Union of Operating Eng'rs, Loc. Union Number 150*, 2017 WL 3581159, at *6 (N.D. Ill. 2017); *see also Sullivan v. Running Waters Irrigation, Inc.*, 739 F.3d 354, 357 (7th Cir. 2014); *Moriarty*, 164 F.3d at 327; *Feinberg v. RM Acquisition, LLC*, 629 F.3d 671, 674 (7th Cir. 2011). "The successorship doctrine applies wherever there is a reorganization that results in a substantial continuation of the prior business by the successor and either obliterates the previous business or leaves it as an empty shell." *See Teamsters Loc. Union Number 705 v. L. Neill Cartage Co.*, 2021 WL 4477888, at *5 (N.D. Ill. 2021) (quoting *Dore*, 2017 WL 3581159, at *6).

This case satisfies both elements for successor liability, in spades.

First, JK Installation had notice of Total Home's liabilities. The same person was the president of each company. Sometimes the left hand doesn't know what the right hand is doing. But here, the same pair of hands was at the helm of each company.

In fact, Ciccone told the funds that JK Installation was taking over from Total Home. When he formed JK Installation, Kevin Ciccone let the funds know that "any debt that was owed by Total Home according to your contract would be assumed and carried over to JK Installation." *See* Kevin Ciccone Dep., at 18:22-24 (Dckt. No. 106-1, at 19 of 64).

25

Second, there was a substantial continuity of operations. It was a "bang-bang" operation. Little changed, except the name on the door. If anything, the transfer could hardly have been more seamless.

Ciccone formed JK Installation "within days" of Total Home going out of business. *See* Kevin Ciccone Dep., at 19:5-8 (Dckt. No. 106-1, at 19 of 64). JK Installation effectively operated as Total Home in all but name – they shared the same managers, employees, assets, client, and business location. *See* Defs.' Resp. to Pls.' Statement of Facts, at ¶¶ 27–29, 34 (Dckt. No. 102). Total Home transferred all of its equipment to JK Installation, and all of its employees joined JK Installation. *Id.* at ¶ 60. JK Installation performed the same business as Total Home, and JK Installation completed the work covered by Total Home's contracts. *Id.* at ¶¶ 60, 62. That's more than enough for a continuity of operations. *See, e.g., Chicago Truck Drivers, Helpers & Warehouse Workers Union (Indep.) Pension Fund v. Tasemkin, Inc.*, 59 F.3d 48, 49 (7th Cir. 1995) ("New Tasemkin's assumption of Old Tasemkin's corporate identity makes a strong case for substantial continuity.").

Again, the 2007 CBA covered the possibility that Total Home could have a successor. *See Int'l Union of Operating Eng'rs v. Centor Contractors, Inc.*, 831 F.2d 1309, 1313 n.3 (7th Cir. 1987) (holding a newly formed partnership was a successor because, in part, "the collective bargaining agreement adopted by the parties to this case expressly bound their 'successors and assigns'") (citation omitted). It's difficult to imagine a company falling within that provision more snuggly than JK Installation.

Defendants do not muster much of a response. They do not offer any facts undermining the conclusion that JK Installation picked up where Total Home left off.

Instead, Defendants argue that JK Installation could not have been bound by the 2017 CBA because JK Installation signed a separate CBA, in its own name, in 2018. *See* Defs.' Resp., at 12 (Dckt. No. 104). According to them, it "defies logic" to think that JK Installation was bound by the 2017 CBA when it signed a 2018 CBA. *Id.* The funds, in turn, reply that the 2018 CBA never went into effect, because the parties simply signed it when trying to reach a settlement, which never happened. *See* Pls.' Reply, at 9 (Dckt. No. 105).

The Court does not need to get into whether the 2018 CBA was, in fact, a collective bargaining agreement between the Union and JK Installation. Defendants never explain why entering into the 2018 CBA would negate or supersede the 2017 CBA. Maybe both agreements applied. Defendants give this Court no reason to think that they are mutually exclusive. The Court will not spin its wheels, trying to figure out a poorly developed argument. *See Greenbank v. Great Am. Assurance Co.*, 2022 WL 3754722, at *7 (7th Cir. 2022) ("We have made clear that perfunctory and underdeveloped arguments, and arguments that are unsupported by pertinent authority are waived."); *Krell v. Saul*, 931 F.3d 582, 586 n.1 (7th Cir. 2019) ("Perfunctory and undeveloped arguments are waived, as are arguments unsupported by legal authority.") (quoting *Schaefer v. Universal Scaffolding & Equip., LLC*, 839 F.3d 599, 607 (7th Cir. 2016)); *see also United States v. Morales*, 572 F. Supp. 3d 502, 508 (N.D. Ill. 2021) ("The Seventh Circuit has repeatedly clarified that underdeveloped and merely perfunctory arguments like this are waived.").

JK Installation is the successor to Total Home, so it is bound by the 2007 CBA as well as the 2013 and 2017 CBAs. As a result, JK Installation bears responsibility for the liabilities of Total Home. Those liabilities include the outstanding judgment in the first lawsuit against Total

27

Home ($65,447.82 and $500), plus the outstanding contributions owed by Total Home from January 2017 to December 2018 ($13,512.74), for a total of $79,460.57.

In addition, JK Installation incurred liabilities in its own right. As the successor, JK Installation stood in Total Home's shoes. Those shoes, in turn, stood on a collective bargaining agreement. So JK Installation had an obligation to pay contributions for fringe benefits and union dues under the collective bargaining agreement.

The funds offered evidence that JK Installation underpaid, by a substantial margin. The audit concluded that JK Installation failed to report or pay fringe benefit and union dues contributions on 10,374.50 work hours. *See* Defs.' Resp. to Pls.' Statement of Facts, at ¶ 74 (Dckt. No. 102). Those hours equate to $320,548.68 in outstanding payments. *See* Laborers' District Council Audit (Dckt. No. 94-8, at 12, 14 of 81) (finding JK Installation responsible for $136,829.53 and $183,719.15 based on unreported hours).[10]

Once again, Defendants come forward with no countervailing evidence. They do not point out any flaws in the funds' calculations, and they do not offer a number of their own. They basically argue that they don't owe anything at all, but after that, they have little else to say.

## IV. Kevin Ciccone (Count V)

The final piece of the puzzle is the claim against Kevin Ciccone himself. Once again, there is no need for a jury because there is no factual issue.

In 2018, Total Home settled the first lawsuit, meaning the case before Judge Guzman. As part of that settlement, Total Home executed an Installment Note to pay overdue fringe benefit contributions, plus liquidated damages, interest, and attorney's fees. *See* Defs.' Resp. to Pls.'

---

[10] The $320,548.68 total comes from two reports in the audit. *See* Laborers' District Council Audit (Dckt. No. 94-8, at 12–15 of 81) (finding JK Installation responsible for $136,829.53 and $183,719.15 based on unreported hours and unpaid union wages).

Statement of Facts, at ¶ 20 (Dckt. No. 102); *see also* Installment Note (Dckt. No. 94-5, at 4 of 64). Total Home agreed to pay $132,500 plus interest over a span of 24 months, from April 2018 to April 2020. It paid about half that amount.

Kevin Ciccone signed a Guaranty as part of that settlement. *See* Defs.' Resp. to Pls.' Statement of Facts, at ¶¶ 21, 22 (Dckt. No. 102); *see also* Guaranty of Payment and Indemnification (Dckt. No. 94-5, at 9 of 64). He saddled himself with a few different obligations.

For starters, he guaranteed "the payment when due of the entire principal indebtedness and all interest evidenced by the Note during the twenty-four (24) month payment period." *See* Guaranty of Payment and Indemnification, at ¶ 1 (Dckt. No. 94-5, at 9 of 64).

But that wasn't all. He also agreed to backstop Total Home's obligations under the CBAs. "The Guarantor *also* agrees to be personally liable for all monthly benefit contributions, union dues and/or wages owed from the Company to the Funds, the District Council, all ancillary funds, and/or the participants that are due at the time the Note and Guaranty are entered into and/or are incurred and become due and owing for the duration of the Note . . . including all interest, liquidated damages, audit costs, attorneys' fees and costs." *Id.* (emphasis added).

The plain language of the Guaranty compels a few different conclusions. First, Ciccone is responsible for the unpaid portion of the Note, totaling $65,447.82 plus $500 for attorney's fees and expenses.

Second, Ciccone must pay Total Home's unpaid contributions for fringe benefits from January 2017 to November 2018, totaling $13,512.74.

Third, Total Home and KAAT were, in reality, a single employer. Total Home is on the hook for KAAT's obligations, and Ciccone is on the hook for Total Home's obligations. So Ciccone is jointly and severally liable for KAAT's unpaid contributions totaling $32,988.97.

Fourth, JK Installation was the successor to Total Home. JK Installation thus stands in Total Home's shoes, and Ciccone must carry the weight of those shoes. Ciccone is jointly and severally liable for JK Installation's unpaid contributions, totaling $320,548.68.

Putting it all together, Ciccone is jointly and severally liable for $367,050.39 in unpaid contributions, based on the contributions owed by Total Home, KAAT, and JK Installation ($13,512.74 + $32,988.97 + $320,548.68). The $367,050.39 number is found in the audit report. *See* Laborers' District Council Audit (Dckt. No. 94-8, at 3 of 81). Defendants do not contest this sum with any evidence. *See* Defs.' Resp. to Pls.' Statement of Facts, at ¶ 75 (Dckt. No. 102).

Fifth, the audit report also included a liquidated damages penalty against Total Home of $4,318.29, and an audit fee of $5,229.92, raising the amount owed to $376,598.60 based on the audit. *See* Laborers' District Council Audit (Dckt. No. 94-8, at 3 of 81). Those numbers are in the audit itself. *Id.* Defendants do not challenge any of these amounts with countervailing evidence. *See* Defs.' Resp. to Pls.' Statement of Facts, at ¶¶ 76, 79 (Dckt. No. 102).

Sixth, and finally, the funds submitted a summary sheet of the audit with two additional amounts due. *See* Summary of Amounts Owed (Dckt. No. 94-4, at 17 of 72). That summary report included additional liquidated damages fees of $71,129.15, and accumulated interest of $35,572.00. *Id.* The creator of the summary report confirmed those two amounts. *See* Marcello Dec., at ¶¶ 7–8, 10 (Dckt. No. 94-1, at 21 of 26). Defendants do not contest these numbers with any evidence, either. *See* Defs.' Resp. to Pls.' Statement of Facts, at ¶¶ 78, 80 (Dckt. No. 102).

Adding the audit total ($376,598.60) and the additional summary sheet fees ($71,129.15 and $35,572.00), you get a total of $483,299.75. *See* Summary of Amounts Owed (Dckt. No. 94-4, at 17 of 72). The funds reference this total in their statement of facts, and Defendants do not offer any evidence to dispute it. *See* Defs.' Resp. to Pls.' Statement of Facts, at ¶ 77 (Dckt. No. 102).

The reader might be struggling to hang on, but there's one last step. The funds added the audit total ($483,299.75) to the unpaid portion of the Note ($65,447.82 and $500), for a grand total of $549,247.57. *See* Pl.'s Mem. in Supp. of its Mtn. for Summ. J., at 14–15 (Dckt. No. 93).

In response to the $549,247.57 grand total, Ciccone offers a smattering of arguments that don't get him very far. He criticizes the funds for relying on "parole [sic] evidence." *See* Defs.' Resp., at 2 (Dckt. No. 104). He also argues that a guarantor "is not liable for anything he did not agree to." *Id.* That's true, as far as it goes. But Ciccone agreed to backstop Total Home's obligations under the CBAs.

There is no genuine issue of fact about the existence of Ciccone's obligation. And there is no dispute that he failed to meet it. The Court grants summary judgment to the funds on the claim against Ciccone.

## V.    Attorney's Fees

Finally, the funds seek reasonable attorney's fees and costs incurred by the funds during this lawsuit. *See* Pl.'s Mem. in Supp. of its Mtn. for Summ. J., at 18 (Dckt. No. 93).

The statute authorizes attorney's fees. "In any action under this subchapter by a fiduciary for or on behalf of a plan to enforce section 1145 of this title in which a judgment in favor of the plan is awarded, the court shall award the plan . . . reasonable attorney's fees and costs of the action, to be paid by the defendant . . . ." *See* 29 U.S.C. § 1132. This section "does not require

31

that a judgment *in its entirety* favor the plan on all claims raised by the plan." *See Chicago Reg'l Council of Carpenters Pension Fund v. Schal Bovis, Inc.* 2017 WL 1196962, at *3 (N.D. Ill. 2017) (emphasis added).

In light of Defendants' delinquent employer contributions, attorney's fees constitute a "mandatory add-on." *See Cent. States, Se. & Sw. Areas Pension Fund v. Murphy Bros., Inc.*, 772 F. Supp. 2d 918, 922 (N.D. Ill. 2011) (quoting *Central States, Se. and Sw. Areas Pension Fund v. Slotky*, 956 F.2d 1369, 1377 (7th Cir. 1992)). The funds are therefore entitled to their reasonable attorney's fees and costs. The Court will separately direct the funds to quantify them.

## Conclusion

For the reasons stated above, Defendants' motion for summary judgment is granted. The Court will issue a separate order directing the parties to file supplemental submissions to pin down the amounts owed, including unpaid fringe benefit contributions and dues, liquidated damages, attorney's fees, interest, and anything else.

Date:   September 6, 2022

_____
Steven C. Seeger
United States District Judge

32